# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

Mozella M. Dyer,

        Plaintiff,

        vs.                    Case No.12-2081 -JTM

Cynthia Lane, *et al.*,

        Defendants.


## MEMORANDUM AND ORDER

Plaintiff Mozella Dyer worked for the Kansas School District serving Kansas City, Kansas until her termination. She brings the present action against defendants Unified School District No. 500, Kelli Mather, Barbara Kirkegaard and Cynthla Lane, alleging race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. and 42 U.S.C. § 1981. In addition, she brings claims against the School District for retaliation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.; deprivation of a property interest in her continuing employment without due process, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983; and breach of an implied-in-fact contract of employment. The defendants have moved for summary judgment or dismissal of Dyer's claims.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie*

*v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

*Findings of Fact*

Dyer began working for the School District in January 1995, when she was hired as a programmer. She was assigned to the Technology Department and given the job title of Technology Manager. While employed in the Technology Department, Dyer also performed certain of the functions of a human resources information systems manager. Dyer was transferred to the Human Resources Department, effective July 1, 2007, where

she was formally assigned the job title of HR Systems Information Manager. She continued to perform that job throughout her tenure with the School District.

At the time of the transfer, Cynthia Lane was the Assistant Superintendent of Business and Finance, and in that capacity she was consulted by Joe Fives, the Director of the Technology Department, and by John D. Rios, then the head of the Human Resources Department, about this transfer. The transfer was recommended and approved because Dyer previously had been working for the Human Resources Department by preparing reports and responding to that department's information needs. The District determined it was not an efficient use of resources for Dyer to continue to report to a supervisor in the Technology Department. Although Lane was consulted about the proposed transfer, the actual decision was made by Fives and Rios.

Dyer had a written job description for her position as Human Resources Information Systems Manager. In that position, Dyer was responsible for database administration, database development, data needs of Human Resources, payroll management, employee leave, applicant tracking, financial and accounting functions, and safety and security of all employee data. She was responsible to the Executive Director of Human Resources. Her job duties included preparation of reports to assist the Human Resources Department with data that could be utilized in decision making.

After her transfer to Human Resources, Dyer was given additional duties to serve as Substitute Teacher Coordinator or Administrator. These additional duties were assigned to Dyer in January 2008. She continued in this role for three and one half years, from 2008 until her removal from that position by defendant Barbara Kirkegaard on or about August 15, 2011.

In her capacity as Substitute Teacher Administrator, Dyer was responsible for retention, training, assignment, and discipline of the District's substitute teachers. In that capacity, she supervised two secretaries/administrative assistants: Sheffer Wynn, who is

African-American, and Rose Vasquez, who is Hispanic-American. She also prepared a Substitute Teacher Manual distributed to all current substitute teachers serving the District. It was Dyer's duty to ensure, without exceptions, that the substitute teachers met their essential functions as set out in the handbook that she created.

With regard to performance evaluation, the handbook provides that formal evaluations of substitute teaches are not routinely completed. However, "when a substitute teacher's performance is reported to be unsatisfactory, the Substitute Services Department will notify the substitute in writing. If a second unsatisfactory performance is reported, the substitute teacher will be notified again in writing and may be scheduled for a conference with the Substitute Teaching Administrator." A substitute teacher "may be removed from the approved substitute teacher list when three (3) or more unsatisfactory reports have been received by the Substitute Services Department." Moreover, a substitute "may immediately be removed for any incident involving incompetence, immorality, insubordination, gross misconduct, neglect of duty, physical or verbal abuse of students or others, and/or for accusations resulting in a criminal investigation."

Dyer acknowledges that was her responsibility to enforce personnel and human resources policies regarding substitute teachers that she oversaw and, specifically, to enforce the disciplinary rules and procedures (up to removal from the substitute teacher list).

On numerous occasions, Dyer disciplined substitute teachers for Handbook violations, particularly after receiving performance complaints from school principals or building administrators. Normally, Dyer disciplined substitutes by simply excluding them from teaching in a particular building. But she also held conferences with substitute teachers and, on occasion, removed persons from the active substitute teacher approved list. Such discipline included an official reprimand of Helen Greaves for making inappropriate comments and use of profane language to students; removal of Romain

Kenner from active substitute teacher status for failure to comply with various rules set out in the Substitute Teacher Handbook; reprimand of Terresa Martinez for violation of Internet acceptable use policy; removal of Bert Flynn from the active substitute teacher list because of complaints from various schools requesting that he not return to their building and because of an incident in which Flynn allegedly put his arm around a student in a choke hold; removal of Jorge Geronimo from active substitute teacher status based on violation of the Substitute Teacher Handbook when he created a disturbance by asking two students for a hug; letter advising Millie Washington that she would be removed as an active substitute teacher if she did not attend three substitute teacher in-service training sessions by a date certain; reprimand of Clarence Rainey for incidents of alleged name calling and use of demeaning language; and reprimand of Leslie Ann Davis for leaving a substitute assignment early to go to a doctor's appointment and for exercising poor judgment by leaving her class unattended to take a student to the office.

Dyer did not personally decide which substitute teacher would be assigned to a particular vacancy. "It was all done systematically through the computer." Each substitute teacher could enter into the computer (the SubFinder) locations, grade levels, and subjects that he or she was willing to teach, and then the computer program would randomly select persons for the substitute teaching assignments available each day. "I had no control over the standard substitute." The Substitute Teachers Handbook explains this random assignment procedure:

> Substitute teachers are called on a rotation basis by the SubFinder system. Although most substituting needs are not known until the day of the assignment, substitutes can expect to be notified as early as three weeks in advance of assignment by SubFinder. SubFinder will call substitutes from 5:00 p.m. to 10:00 p.m. and will resume calling at 5:00 a.m. and will continue until approximately 90 minutes before an assignment is scheduled to begin.

The only authorized exceptions to the assignment of substitute teachers through the SubFinder system are: (1) assignment of an emergency substitute teacher, which would be accomplished by either Dyer or the substitute teacher secretaries, (2) when a school

principal asks for a specific substitute teacher, or (3) when the SubFinder system had failed to fill a vacancy.

Dyer reported to Tom Petz, Substitute Teacher Administrator, a Human Resources Director, until he retired in June, 2010. She then reported to Kirkegaard, who had become the Lead Human Resources Director. Kirkegaard continued to supervise Dyer until her termination.

In March 2008, Dyer submitted a "Classified Grievance Form" to the School District in which she requested additional compensation for having taken on the Substitute Teacher Administrator duties two months earlier. She withdrew her grievance on April 7, 2008. By e-mail on that date, she wrote to Jill Shackelford (with a courtesy copy to Rios),

> I would like to rescind my classified complaint and apologize for any inconvenience that I may have caused for my previous actions. I understand that in this era we are all trying to do more with less. Everyone has to step up and give more of one's self . This is not an act to lessen one's value but a testament to the character and integrity of individuals.

Dyer renewed her request for additional compensation on May 28, 2010. She e-mailed Lane with a request for a raise based on performance of both Human Resources Information Systems Manager and Substitute Teacher Administrator job duties. She wrote, "I am highly aware that we are in a budget crunch," but nonetheless requested a "position adjustment/correction" so that she would be placed in a Director position, at Class 13, Step. B. "I know everyone has received additional duties but I have received additional duties, as well as an additional job."

On June 11, 2010, Dyer e-mailed Jayson Strickland, Assistant Superintendent of Teaching for Learning, asking about her request. "I had e-mailed it to Dr. Lane; she replied that it was forwarded to you." Strickland is African-American. On June 29, 2010, Dyer emailed District Superintendent Ray Daniels, seeking a merit increase of one additional step on the Class 5 salary matrix because of her work putting the SCI Financial and Human Resources and Payroll system in place.

Dyer's e-mail correspondence indicates that between May and September 2010, she was seeking a "fair and just" compensation increase from Strickland, including placement on a Class 13 salary level. A September 17, 2010 e-mail from Strickland to Dyer states that he would "follow up with" Kirkegaard "so that we can come to a resolution regarding this issue."

Kirkegaard recalls meeting with Strickland about Dyer's request for additional compensation. She told Strickland that she did not believe it would be appropriate to place Dyer on a Class 13 salary level (up from a Class 5) because that is a level assigned to Human Resources Directors and other School District Directors, and is only one level below executive directors and assistant superintendents. Putting Dyer on a Step 8 would have put her on a level above all of the human resources directors.

Although he sought input from Kirkegaard, Strickland made the decision not to raise Dyer from a Class 5 to a Class 13 pay level. There were no other Class 5 employees in the Human Resources Department who were raised to a Class 13 pay scale during 2010.

It is uncontroverted that the District has substantially reduced its work force over the past several years due to cuts in state funding in a cumulative amount of $63 million. In 2009, the School District received a cut of almost $30 million, in state funding, requiring 400 lay-offs "so everyone that remained had to take on additional duties." For example, the Director of Human Resources took on supervision of the Migrant Program and After School tutoring program. Dr. Kelli Mather, Chief Financial- Officer, took on supervision of the Department of Educational Research and Assessment. The Director of Student Services took on the supervision of the Alternative School Program and the Homeless Program. The Director of Curriculum has been assigned oversight of the Professional Development Committee. Strickland was assigned supervision of 6 departments. Four assistant superintendent positions were consolidated to two. Kirkegaard took on additional duties in the Human Resources Department.

Dyer was not required to perform at any higher level or rate than others in School District management positions. Kirkegaard testified that, "We had to do everything we could to help meet the needs of our kids because we had a lot of funding cuts so we lost a lot of positions. In order to ... get the work done and help meet the needs of our kids and our students and our schools we had to work beyond the regular duty day." Lane testified that "there's probably not a position at central office that doesn't have additional duties to what they had prior to that cut," and "everybody's doing more with less, not only at central office, but throughout the whole school system. "

Budget shortfalls and cuts specifically required reductions in force in the Human Resources Department, which had to be restructured with additional duties assigned to the employees remaining in the department. With the employee layoffs and a hiring freeze, District employees had to pick up more work and do things that they were not required to do in the past. Dyer herself acknowledges that the Human Resources Department has been downsized, and that due to the reductions in force it has been regarded as good fortune in the Department simply to keep one's job.

Managerial and supervisory employees of the District generally have not received additional compensation for taking on additional duties, work, or jobs. Supplemental contracts are only available where an employee takes on job duties that are very different from the previously assigned job, such as a classroom teacher who becomes a sports coach. Supplemental contracts are available only to bargaining unit employees. As an administrator, Dyer could not be given a supplemental contract and was expected to do whatever it takes to perform her assigned job tasks. Due to the budget cuts, most managerial employees have worked more for the same salary.

In her Response, Dyer indicates three instances in which managerial employees were given additional compensation, but these all appear to involve exceptional circumstances, such as when the District Director of Procurement was also made to serve

as Athletic Director, necessitating substantial work on evenings and weekends, or when managerial employees were given one-time awards for work on specific projects.

Prior to the end of 2010, District administrative offices were located in a central office location in downtown Kansas City (approximately 65,000 square feet) and an Indian Springs office (approximately 100,000 square feet). Effective January 1, 2011, those 2 offices were consolidated into a single location, with the total amount of office space now much reduced. The new consolidated School District administrative office is located at 2010 North 59th Street, Kansas City, Kansas. The entire Human Resources Department has moved to this new location.

It was the responsibility of Kelli Mather, Chief Financial Officer, to assign and allocate office space at the new consolidated central office, with Mather having to allocate the space that every employee needed to do his or her job. "There's not a formula. It's a decision based on job functions."

Dyer had an office in the central office building in downtown Kansas City. Some time during December 2010, the floor plan for the new consolidated office space was released, including office space for employees of the Human Resources Department. That floor plan showed that Dyer would be assigned a cubicle, not an office. Strickland told Kirkegaard of this assignment, and Kirkegaard in turn discussed this office the cubicle assignment with Dyer.

Kirkegaard recalls telling Strickland in December 2010 that she had some confidentiality concerns about assigning Dyer to a cubicle because Dyer's job duties included unemployment hearings, interviews, and disciplinary meetings. Strickland told Kirkegaard that there would be a conference room located near Dyer's cubicle that Dyer could use for those activities. He also told her that there would be sufficient space assigned to Dyer so that she could perform her job.

Kirkegaard told Dyer that she would be able to perform all of her confidential job

tasks in the conference room. After reviewing her assigned office space in the new building, Dyer e-mailed Strickland requesting that she be given closed office space.

Strickland emailed Dyer that offices might be available for coordinator-level managers. However, it had been determined that "you being in a secluded cubicle close in proximity to conference rooms would have to suffice for now. You will have consistent access to those conference rooms to conduct confidential business."

Kirkegaard later told Strickland that if the criteria for receiving an office was being in a position of "coordinator or above," then Dyer "qualifies for an office. She is a class 5 administrator which is way above a class 3 coordinator." Kirkegaard recalls further discussions with Strickland about Dyer's assignment to a cubicle, instead of an office, in January 2011. At some point in time, Strickland told Kirkegaard that the cubicle would be assigned to Dyer for the time being.

Lane, who became School District Superintendent on July I, 2010, was advised by either Strickland or Mather about Dyer's request to be assigned an office in the new administrative offices. Lane discussed this matter with Mather, and they agreed that the general principle for assigning space should be "space adequate to do the job duties for the individuals." Directors generally were to have offices of roughly equal size, shared office spaces had to have enough space for more than one employee, and cubicles generally had standardized sizes. Mather followed those criteria in allocating office space.

Mather determined that Dyer would not be assigned an office because she was given a cubicle "that was several times larger than other employees in the building, so office or not, she had what she needed in order to perform her duties." Her cubicle was a larger-size one so that she could have the things she needed to do her job, and the cubicle was located outside of a conference room that she could use when necessary to meet with the substitute teachers.

Dyer was not the only coordinator level employee who was not given an individual

office. For example, Darryl Garrison was assigned a cubicle. Coordinators, like other employees, "were given space that was designed so that they could do their job." Other employees classified as administrators have similar space as was assigned to Dyer in the new office location. Other administrators were given a shared office, with two or three employees per office.

Lane deferred to Mather to determine the adequacy of assigned office space, including the space assigned to Dyer. When Mather tells her that assigned office space is adequate, Lane accepts that. "I'm more concerned about the fact we have kids that have classrooms in closets than I am about the size of somebody's office or cubicle space."

The cubicle assigned to Dyer in the new administrative offices is not standard size, but is larger than all of the other cubicles in use in the Human Resources Department. It has higher walls than the standard cubicle. Dyer could also use the adjacent conference room as needed. While Dyer complains in her response that she had to share the conference room with other employees, she acknowledges that she had access to the conference room, and makes no claim that the access to the conference room was ever denied when she needed it. Dyer has acknowledged that after the move to the new office location, she received a larger cubicle than she had originally been assigned and that if she needed a confidential space at the new office location, one would be provided.

Armand Dyer , Jr., the plaintiff's husband, was employed by the School District as a paraprofessional at Coronado Middle School between October 2006 and February 2008. The plaintiff signed a document dated January 30, 2008 that approved Armand Dyer for service as an emergency substitute teacher effective January 20, 2008. John D. Rios, then Assistant Superintendent for Human Resources, approved Armand Dyer for an "additional position of emergency substitute teacher, "effective January 30, 2008, and so advised Armand Dyer by letter dated February 13, 2008. When Armand Dyer became a substitute teacher for the District, he received a copy of the Substitute Teacher Handbook and he

attempted to follow its rules and instructions.

Kirkegaard, Lane, and Edwin Hudson (who became Chief of the Human Resources Department in May 2011) did not know that Armand Dyer was a School District substitute teacher, or that Dyer was supervising him in her capacity as Substitute Teacher Administrator until August 2011 when investigation of job performance issues relating to the plaintiff was undertaken by the Human Resources Department. Dyer alleges she mentioned her husband to Hudson and Kirkegaard in May of 2011. Both Kirkegaard and Hudson flatly deny this.

During Dyer's tenure as Substitute Teacher Administrator, the Substitute Services Department received numerous written complaints about the job performance of Armand Dyer as a substitute teacher. These included:

(i)    a report of a no-show on May 7, 2008 for a teaching assignment at Fairfax campus;

(ii)   October 28, 2008 correspondence from the principal of Argentine Middle School about "multiple complaints regarding the substitute Armand Dyer," including inappropriate discipline of a student arriving late to class, pantomiming like he was smoking something during class, and use of profanity; request is made that Mr. Dyer "not be assigned to Argentine in the future";

(iii)  an April 15, 2011 e-mail from the principal of the Morse/Lamb Early Childhood Center addressing job performance issues relating to Armand Dyer during the past 2 days, including complaints of tardiness, failure to accompany children to recess, failing to be present in the classroom when the children returned from recess, and being a no show;

(iv)   a May 9, 2011 e-mail from the assistant principal of Central Middle School requesting that Armand Dyer "not return" to the School and that he be taken off "our list" because after having "got onto" a special education student "about

chewing gum (which is against school rules) he passed out gum to all the students. He later had all the students stand up and dance and was continually in conversation with the students all during checkpoint testing";

(v) a May 17, 2011 e-mail from the principal of Lindbergh Elementary School to plaintiff stating that "I do not want Mr. Dyer to substitute at Lindbergh again" due to tardiness in arriving at school, delay in taking students to P.E., having students watch cartoons and eat suckers during science time, failure to supervise students during recess, and failure to control his class, and

(vi) a May 20, 2011 e-mail from principal of Parker Elementary School requesting that Armand Dyer not be allowed to substitute at her school due to his actions as a substitute teacher the day before in using "inappropriate language with the students" and selling gum to the students, "which is also inappropriate."

According to Armand Dyer, at no time had plaintiff shared with him the complaints about his job performance received from schools where he had been a substitute teacher. She may have discussed with him once a job performance complaint. Specifically, he had never been advised that the principals at Parker Elementary, Lindbergh Elementary, Argentine Middle, and Central Middle Schools had requested that he not be assigned again to their schools as a substitute teacher.

The plaintiff admits that she received job performance complaints about Armand Dyer, that she did not share these complaints with Armand Dyer, that she did not advise or counsel Armand Dyer in writing about those complaints, and that she never disciplined Armand Dyer because of those complaints.

Dyer testified to three reasons or rationales for not taking disciplinary action against her husband or giving him notice of job performance complaints. First, she claims that she had to prioritize complaints as they came in, "and it was something that was not serious, then I postponed the handling of those complaints." Second, she has testified that she was

too busy putting together the STAR Teacher Banquet to respond to the job performance complaints received about substitute teachers and it was her intention to handle them at a later date. Third, she simply did not believe the complaints and representations made by the school principals about Armand Dyer's job performance.

It is uncontroverted that Dyer never told her supervisors about the numerous job performance complaints made about her husband.

In early August 2011, Wynn and Vasquez, the secretaries who worked directly under the supervision of Dyer, reported to Hudson (Chief of the Human Resources Department) that they were frustrated that nothing was being done about the job performance complaints against Armand Dyer, and about Armand Dyer continuing to receive substitute teacher assignments although he had been blocked from teaching at several schools. Hudson responded by asking Kirkegaard, Dyer's direct supervisor, to investigate.

In reviewing the personnel file of Armand Dyer as part of her assigned investigation, and in meeting with Hudson and another Human Resources director Stephen Vaughn, Kirkegaard confirmed what Hudson had reported to her – that Armand Dyer was employed as a substitute teacher and, therefore, was under the direct supervision of his spouse, Dyer. This direct supervisory relationship was contrary to the anti-nepotism policy of the School District, but it was not a basis for Kirkegaard's subsequent recommendation that Dyer be terminated.

In the course of her investigation, Kirkegaard received and reviewed documentation about the job performance complaints against Armand Dyer which Dyer had not addressed. Either Wynn or Vasquez provided these documents to Kirkegaard.

In the course of her investigation, Kirkegaard received and reviewed documentation from the SubFinder system that substitute teaching assignments had been prearranged for Armand Dyer. Those documents were provided to Kirkegaard by Wynn and Vasquez, the

secretaries for the Substitute Teacher Office.

In the course of her investigation, Kirkegaard met with Dyer on August 15, 2011 to discuss with her "supervision issues about her husband Armand Dyer" — both the failure to address the job performance complaints against Armand Dyer and the prearranging of substitute teaching assignments for Armand Dyer.

During that meeting, Dyer "admitted that she had received complaints about Armand in April and May of 2011, and that she had not followed up on them." Kirkegaard and Dyer reviewed the procedures for dealing with complaints about substitute teachers. According to Kirkegaard, Dyer "stated that at the time she didn't feel like the issues of being late and a few other things were a big deal and the principal can ask to block out a person if they don't want them back in their building." Dyer advised that she had received complaints about other substitute teachers during this time frame about which she also had not followed up, "but it wasn't multiple complaints on the others" — that is, other than Armand Dyer. When asked specifically why she had not dealt with the multiple job performance complaints against Armand Dyer, Dyer gave Kirkegaard several reasons - difficulty balancing her work load and personal life, wanting to keep peace at home, and that she did not see the complaints against Armand Dyer as being a big deal.

In responding to the motion for summary judgment, Dyer has submitted an affidavit stating that she did not tell Kirkegaard she had difficulty balancing her work load and her personal life, or that she needed to keep peace at home. She states that she told Kirkegaard she planned to deal with the complaints against her husband at a later date. Dyer also generally defends her lack of action on the basis that it was her "normal" discipline was to simply block the substitute from reassignment to a particular school.

But it is uncontroverted that Dyer had also employed more serious discipline against other substitute teachers, including counseling them or removing them from the substitute list. At a minimum, policy called for written warning or notice to substitute teachers. Here,

Dyer investigated none of the complaints, and it is uncontroverted that she did not even mentioned them to her husband. Despite the obvious conflict of interest, she made no attempt to alert her supervisors of the situation. It is also uncontroverted that, whatever Dyer's "normal" approach to substitutes receiving a complaint, there were no other instances of substitutes receiving complaints from numerous schools, including multiple complaints the same school. Finally, as to Dyer's statement by affidavit that she told Kirkegaard she planned to deal with the complaints "at a later date," it must be noted that by the time Kirkegaard spoke with Dyer, those complaints had been essentially ignored for months or years.

At the meeting, Kirkegaard asked Dyer about prearranging substitute teacher assignments for Armand Dyer during the 2010-2011 school-year. According to Kirkegaard, Dyer admitted doing this on 30 occasions. She emphasized that her husband did not ask her to do it, but "explained that she was just trying to find him work." When asked if she did this prearranging for anyone else, Dyer said "no only if a principal asked for a sub to be prearranged." Hudson has also testified that, in a meeting with Hudson and Kirkegaard, Dyer "apologized for it," acknowledged that it was wrong, and stated it should not have happened.

Kirkegaard asked Dyer if she saw anything wrong with prearranging substitute job assignments for her husband. Dyer did not seem to believe that what she had done was wrong, but she stated that she could see that her actions might be regarded as preferential treatment. She represented to Kirkegaard that she was just trying to get her husband work and that he had only earned about $9,000 as a substitute teacher.

In her affidavit submitted in response to the summary judgment motion, Dyer acknowledges the prearrangement, although she denies telling Kirkegaard she had done so 30 times. Rather, she stated she prearranged "some" assignments for her husband. She denies acknowledging that the prearrangement could be seen as preferential treatment, or

that she was just trying to get her husband work.

During her deposition, Dyer stated her suspicion that the substitute secretaries, Wynn and Vasquez, may have committed similar acts of prearranging substitute teacher assignments, but she has no proof that this ever occurred. It is uncontroverted that Kirkegaard instructed Dyer to discontinue the prearrangement of substitute teaching assignments for her husband.

After her initial investigation, Kirkegaard prepared a preliminary report to Hudson on August 15, 2011, in which she concluded that Dyer

> abused her authority as sub office manager by prearranging 30 substitute assignments for him during the 2010-2011 school and should have come forth to a H.R. Director when multiple complaints were coming in about her husband so the issues could be dealt with. While she has been removed from the role as Administrator of the Substitute Office, appropriate disciplinary action is needed to document this issue.

Kirkegaard considered it possible that she would recommend Dyer's termination. She wanted to obtain additional information and look at some other things before making a specific disciplinary recommendation.

After Kirkegaard submitted her preliminary report, Hudson directed her to obtain specific information about Dyer's prearranging of substitute teaching assignments for Armand Dyer and to make a discipline recommendation.

Kirkegaard completed her investigation of Dyer's job performance by obtaining more specific information about each of the 30 substitute teaching assignment jobs that Dyer had prearranged for her husband during the 2010-2011 school year. That information was included in Kirkegaard's final report of investigation to Hudson, dated August 24, 2011.

Kirkegaard's review of the incidents disclosed three occasions on which Dyer's decision "created a situation where other substitutes did not have an opportunity to substitute due to all the other sub jobs being filled." This fact confirms "that the prearranging had an economic impact on others and unfairly benefitted her husband ... In

at least these 3 instances of prearranging sub jobs, Mozella's husband had an economic gain from the preferential treatment Mo gave him. "

Dyer disputes this fact, but only to the extent of arguing that "[m]any" of the 30 prearrangements should not be seen as improper, since the SubFinder system had failed to make an independent match. Of course, this concedes that other instances were improper. Further, even where the SubFinder failed to make an independent match, there is no evidence that Dyer ever attempted to contact any other potential substitute, instead of simply giving the assignment to her husband. The evidence is uncontroverted that such actions circumvented the random assignment policy and rendered a direct an economic benefit to Dyer through her husband.

In her final report, Kirkegaard noted that the principals of multiple buildings had requested that Armand Dyer never return to substitute teach in their building. "Despite the numerous complaints, Mozella never took any action on them other than blocking him out of buildings when requested. She should have brought these complaints to the attention of her supervisor so that appropriate action could be taken. This is another example of the preferential treatment that Mozella provided to her husband." Kirkegaard recommended that Dyer be terminated, based on the fact that Dyer's husband profited from her abuse of power "and other employees suffered a loss on at least 3 occasions," and that Dyer's failure to take action on the complaints about her husband "constitutes a failure to perform duties and conduct unbecoming an employee." Terminating Dyer "would hold her to the same standard as Keith Woolridge, an employee with no previous disciplinary issues who was recommended for termination for providing his brother with $60 of copper."

Kirkegaard made the recommendation for termination because Dyer had committed a serious breach of trust while holding a position in which she had great access to confidential information. Specifically, she had used her access to the SubFinder system to obtain substitute teaching assignments for her husband and in not advising her supervisors

about job performance complaints made against her husband, "and in so doing [she] allowed our students to experience harm." Dyer had access to computer systems that required trust, including the JM system which records updates and changes to salaries of School District employees "and the fact that she would do something like this with the SubFinder system, it frightened me because of the access that she had to the JM system and all the changes she could have made in that system."

In Kirkegaard's assessment, the numerous job performance complaints received in the Substitute Teacher Office relating to Armand Dyer demonstrated gross misconduct, neglect of duty and incompetence, which would have justified his immediate removal from the active substitute teacher list. Armand Dyer was not performing the essentials functions of his job and it was Dyer's supervisory responsibility to have taken appropriate disciplinary action against Armand Dyer. In Kirkegaard's view, the failure of Dyer to do so, standing alone would have justified Dyer's termination, because Dyer repeatedly placed her husband in substitute teaching assignments knowing that he had not been performing those assignments in an acceptable manner.

Kirkegaard considered it frightening that Dyer's explanation for not bringing the complaints to her attention was that Dyer did not see the issues as a big deal. If Dyer did not believe the performance issues raised by school principals about Armand Dyer were a big deal, "it really showed to me her lack of concern for our students, that ... their education wasn't a big deal having a person who is going to try to continue instruction on a day-to-day basis is not a big deal. It was shocking to me." In her assessment, by prearranging substitute teaching assignments for her husband and not reporting to her supervisors the job performance complaints against her husband, Dyer "allowed our students to experience harm."

After her submission to Hudson of her final report of investigation dated August 24, 2011, Kirkegaard met with Hudson, who agreed with her assessment. Hudson then

discussed the termination recommendation with Superintendent Lane. He told Lane that his recommendation was based on Dyer's actions both in prearranging substitute teaching assignments for her husband and in failing to address the complaints about him.

Lane concurred in Hudson's recommendation that Dyer be terminated. Lane had been advised of the ongoing investigation of Dyer for prearranging substitute teaching assignments for her husband and for not taking action in response to multiple complaints about her husband's job performance. Lane submitted the termination recommendation to the School Board. She recommended that termination for two reasons. First, Dyer "inappropriately put her husband in front of other subs to gain financial benefit." Second, by not acting on job performance complaints relating to Armand Dyer, "she put our kids at risk by knowingly sending him out with behaviors that were potential safety risks to our kids." In addition, Dyer "was in a position that gave her great access, and I have to tell you, I was extremely disappointed that she would conduct herself in this way. She had great access to confidential things through the system, was a trusted employee for a long time."

On or about September 2, 2011, Dyer met with Kirkegaard and Vaughn and was given a letter advising her that she was being recommended for termination to the Board of Education and was being suspended without pay, effective immediately, pending the Board's decision. That letter advised Dyer that the factual bases for the termination recommendation were, first, that on 30 occasions during the 2010-11 school year, Dyer had "showed preferential treatment to your husband, Armand Dyer, by using your administrative access to the SubFinder System to prearrange substitute jobs for him." This abuse of discretion and conduct "resulted in a monetary gain for your husband. " Second, Dyer had showed preferential treatment to her husband by not taking disciplinary action against him after learning of multiple issues regarding him in April and May 2011. If Dyer felt uncomfortable discussing these performance issues with her husband, then she should have brought them to Kirkegaard's attention "so that appropriate action could be taken."

The letter also set out the Board personnel policies that Dyer had violated by her actions — conduct unbecoming an employee; unauthorized conversion of school property by the employee for his/her own use, and other just causes as may conform to the laws of Kansas.

Kirkegaard handed the recommendation of termination letter to Dyer during the September 2, 2011 meeting and asked Dyer if she had any questions. Dyer had none, and Kirkegaard then advised Dyer that she would be scheduled for a pre-termination or *Loudermill* meeting.

By letter from Hudson dated September 6, 2011, Dyer was advised that a September 9, 2011 meeting had been scheduled for her "to review the recommendation" for termination. Hudson further advised that if Dyer failed to attend this meeting or submit a written letter of resignation, "the recommendation will be submitted to the Board of Education at its next scheduled meeting on Tuesday, September 13, 2017, to terminate your employment."

Dyer declined to attend the pretermination/*Loudermill* meeting, instead submitting a letter to Kirkegaard (with courtesy copies to Hudson and Lane) dated September 9, 2011. Kirkegaard reviewed the contents of this letter with Hudson. In the letter, Dyer did not deny that she prearranged substitute teaching assignments for her husband during the 2010-2011 school year, and did not deny the number of prearranged assignments were 30 in number. Instead, she stressed that no one had previously told her "was something remiss" in what she had been doing. Consistent with her current affidavit statement, she states that she "never admitted to any guilt."

However, directly contrary to her affidavit's denial that she had rationalized her conduct on the basis of the small salary her husband had earned, Dyer's 2011 letter stresses that "I explained to you that Mr. Dyer only earned $7,000 for the 2010-2011 school year for which he worked each and every day." She further sought to justify this conduct by asserting "that support staff here are also able to pre-arrange jobs" and by asserting that

"preferential treatment" of her husband would have occurred had Dyer placed him in a vacancy position "where he could have worked for 186 days at a higher rate of pay" or placed him into "a long-term position where he could have received a higher rate of pay." Having not done the latter for her husband, Dyer apparently saw nothing wrong with the prearranging of the 30 substitute teaching assignments.

Dyer stated that she had not disciplined her husband because she was unable to attend during this period to disciplinary matters "because of job responsibilities that possessed a greater sense of urgency" and because Armand Dyer's actions "were neither detrimental nor harmful to the well being of the students within the Kansas City, KS Public Schools. " It was Dyer's intention "to handle his allegations, as well as the other minor allegations regarding substitute teachers that had been made during April and May at a later date."

The Board of Education voted to terminate Dyer's employment effective September 13, 2011. On or about September 14, 2011, Dyer received written notice that she was being terminated from her employment. The September 14, 2011 termination letter from Hudson advised Dyer of her right to request a termination hearing.

After receiving the termination letter dated September 14, 2011, Dyer requested and was granted an evidentiary termination hearing before a two-person committee of the School Board, which was held on October 24, 2011.

Prior to such post-termination hearing, Dyer was advised in writing, by letter dated October 19, 2011, from Vaughn, Director of Human Resources, that the District had discovered an additional 83 instances of prearranged substitution favoring her husband.

Dyer responds to this fact by stated that it is "Controverted in part," citing her affidavit. However, as with her denial of the original 30 instances of prearrangement, Dyer's 's actual affidavit statement is carefully circumscribed, denying only that she prearranged "83 substitute teaching assignments" for her husband.

It is uncontroverted that the post-termination hearing in Dyer's case was held pursuant to standard School District policies and procedures. The full seven member board, not any employee of the School District including the Superintendent, decides which Board members will serve as hearing officers. Selection for service as hearing officers in post-termination matters is random, but all of the School Board members have served as hearing officers at one time or the other. The hearing officers do not discuss the facts of the case with either District administrators or counsel prior to the hearing.

George Breidenthal, a School Board member for 29 years, was one of the two hearing officers at Dyer's October 24, 2011 post-termination evidentiary hearing. The other Board member who served on the hearing committee was Evelyn Hudson. Kirkegaard, Edwin Hudson, Sheffer Wynn, and Dyer testified. Dyer appeared with counsel who was given the opportunity to cross-examine School District witnesses. Dyer also submitted documents relating to her employment.

At the post-termination hearing, Dyer agreed that she had prearranged substitute teaching assignments for her husband.[1] The two-member hearing committee, after hearing the evidence, jointly concluded that Dyer's termination should be upheld.

Breidenthal reached this conclusion because Dyer had not removed Armand Dyer from the approved substitute list despite the number of complaints, and because of the prearranged substitute teaching assignments for her husband. Breidenthal concluded that the District had just cause to terminate Dyer and that the School District had presented fair reasons for its disciplinary action. Continuing to assign as a substitute teacher a person,

---

[1] Dyer contends that it is not "prearrangement" if the SubFinder system fails to independently fill a vacancy on its first rotation. But Dyer's affidavit fails to indicate this explanation was ever made to the Board. Further, as noted above, Dyer's action in *unilaterally* awarding such a vacancy to her husband, over other available substitutes, was inconsistent with District policy favoring random assignment. Dyer does not aver she told the hearing committee that prearrangment never happened, only that she "did not admit that I had prearranged 30 substitute teaching assignments for my husband." (Dyer aff. at ¶ 16).

whether or not it was Dyer's husband, who on multiple occasions had been requested or recommended not to serve in that capacity, is a violation of character standards as well as a breach of School District policy. Breidenthal continues to believe that the termination should be upheld "[b]ecause of the facts of the case, that we had a supervisor who did not perform their supervisor duties in a respectful and positive manner."

Consistent with District procedure, after the two-member hearing committee reached its decision to recommend upholding the termination, the committee members spoke with the School District attorney. Counsel then drafted that report, subject to approval by the members of the hearing committee.

On or about October 25, 2011, both Evelyn Hudson and Breidenthal signed the Hearing Committee Report recommending that Dyer's termination be upheld by the Board of Education. The report included findings of fact, including that

> Ms. Dyer abused her authority as the substitute office manager by using her administrative access to the SubFinder system to prearrange substitute teaching assignments for her husband and by concealing the multiple complaints she received about her husband's work performance. Ms. Dyer's preferential treatment of her husband resulted in a direct financial benefit to her husband and, ultimately, to her. Ms. Dyer's actions show poor judgment as an administrator and are a violation of her managerial duties.

Under "Conclusions," the report states that the evidence supported the Administration's position that Dyer violated managerial standards in the preferential treatment that she gave her husband, that the evidence (through testimony of Dyer, Wynn and Kirkegaard) established that Dyer knew her husband was not a good substitute teacher but nevertheless she continued to assign him substitute teaching positions, that there was convincing evidence of Dyer having prearranged many substitute teaching jobs for her husband during the past 2 school years in "blatant disregard for the welfare of students," and that Dyer was aware of the policy allowing for termination of a substitute after three complaints "as Ms. Dyer herself was involved in implementing the policy and the Substitute handbook." In sum, "Board Policy provides that employees may be terminated

for just cause' insubordination, and failure to obey rules reasonably promulgated by the Board of Education. Ms. Dyer's actions violate these principles and warrant her termination from employment."

After presentation of the Hearing Committee disciplinary action recommendation, the full School Board voted to uphold Dyer's termination at its October 25, 2011 regular meeting. The School Board members read the Hearing Commission written report before voting to uphold Dyer's termination.

Dyer acknowledged in her deposition that she has no evidence that Kirkegaard discriminated against her because of her race. She testified that she believes Lane discriminated against her because of her race "when she put me in a position where my work space was not equivalent to my peers." When asked what evidence she had that she was placed in a work space not equivalent to her peers because of her race, Dyer responded, "I haven't ... just the fact that it occurred." Lane never made any racially charged or derogatory statements to Dyer. Dyer testified that she has no evidence that Mather, Tom Petz, or Jayson Strickland discriminated against her because of her race.

Kirkegaard recalls that during the summer of 2011, Dyer expressed concern to her that support staff at the Northwest Middle School were not being paid in a timely manner because they had gone back to work 5 days earlier than normal. Kirkegaard brought this matter to the attention of Hudson, who concluded that there was no issue and that nothing needed to be changed. Hudson does not recall discussing with Dyer any issues relating to compensation at Northwest Middle School. He may have had such discussions with Vaughn or Kirkegaard, because " [w]e have those type of discussions with all directors when issues come up that are related to wage and hour." Hudson does not recall any discussions in the summer of 2011 with Dyer or anyone else about whether the secretaries in the Human Resources Department were exempt or nonexempt employees under the Fair Labor Standards Act. Samples also does not recall Dyer ever raising with her an issue about

whether secretaries in the Human Resources Department are exempt or non-exempt under the FLSA.

Dyer had no responsibility or assignment to monitor support staff issues relating to Northwest Middle School, and has no specialized knowledge or training in overtime compensation under the Fair Labor Standards Act. Her job tasks did not include FLSA compliance.

### Conclusions of Law

The plaintiff's claim of racial discrimination is measured under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Dyer has the burden of presenting a prima face case of discrimination. If she does so, the defendant must articulate a legitimate, nondiscriminatory reason for its employment decision for its actions. If such a reason is presented, Dyer may show that the proffered rationale is merely a pretext for underlying discrimination.

Here, the court finds that plaintiff has failed to present a prima face case of discrimination, in that she has presented evidence showing an inference of discriminatory intent and failed to show that similarly-situated employees were treated preferentially. *See Sorbo v United Parcel Service*, 432 F.3d 1169, 1113 & n.5 (10th Cir. 2005).

Dyer has failed to show that any similarly-situated, non-African American school employees were treated differently from her. While the evidence shows that Dyer did not receive standard wage increases, the evidence shows that the school district faced a financial crisis which restricted the wages of all employees. While Dyer has pointed to three individuals who did receive extra pay, she has failed to show that these workers were in fact similarly situated to her. Rather, the facts show that these individuals received bonuses, not salary increases, or received the extra benefits as the result of the assumption of additional job duties substantially unlike their previous work (as when the Procurement

Director also assumed the duties of Athletic Director).

Dyer also complains that she did not receive a separate office in the new District headquarters, but was instead assigned one of the largest cubicles. However, there is no evidence that the assignment negatively affected Dyer's ability to perform the duties of her job.

Finally, there is no evidence that other, non-African American employees were allowed to keep their jobs after engaging in misconduct of similar gravity. While Dyer points to an incident involving the principal and vice-principal of Washington High School, the facts show that the incident is not comparable. The incident cited by Dyer involved the negligent failure to follow District accounting policy, and there is no evidence of either intentional misconduct or self-dealing, as with Dyer's circumvention of the random substitute assignment system in favor of her husband.

Moreover, even if Dyer had made a prima facie showing as to her claims of race discrimination, summary judgment would remain appropriate. Here, the facts establish that the defendants had legitimate, nondiscriminatory reasons for their actions, and Dyer has failed to show that the defendants' actions were a pretext for discrimination.

As noted previously, it is uncontroverted that during this time the District faced a severe financial crisis, requiring both budget cuts and layoffs. The District was forced to consolidate its offices into newer, smaller facilities. Almost all managerial employees were required to take on additional job duties.

Dyer, indeed, acknowledged this fiscal reality when she withdrew her initial salary grievance in 2008. While she later renewed her request for a salary increase (from Class 5 to Class 13), the result would have meant Dyer would be earning more than her supervisors. With respect to office space, Dyer has failed to show that other offices were in fact available, that she was unable to do her job from her cubicle, or that anything other than standard business decisions determined the allocation of office space in the new

District building.

Finally, the District has a legitimate, nondiscriminatory reason for terminating Dyer. The District's investigation revealed that in numerous instances, she had secretly circumvented the District's system for the random assignment of substitute teaching positions. She did so giving preference to her husband, yielding a direct economic benefit to both her husband and herself. In addition, the investigation revealed that Dyer had failed to process complaints against her husband which were both numerous and serious. She made no attempt to either alert her superiors to the situation, or even to tell her husband.

When confronted with the results of the investigation, Dyer did not contest those findings. While she now disagrees with the precise *number* of instances of misconduct, the facts are essentially uncontroverted that an independent investigation had shown two separate grounds for the adverse action imposed by the District. The District had a legitimate, nondiscriminatory reason for its action, given either the circumvention of the random assignment process, or the failure to deal promptly and effectively with the complaints involving plaintiff's husband.

Finally, the court finds no grounds for concluding the District's rationale was pretext for discrimination. The District's findings were supported by a thorough investigation, which began after the District received complaints from Dyer's subordinates about her conduct. The existence of numerous and serious ethical lapses on Dyer's part is clear. Even if she now argues that she did not admit to every lapse documented in the District's investigation, the fact remains that the District documented a pattern of improper conduct. Nothing in the record suggests that the defendants were motivated by anything other than a concern for the proper enforcement of District policies, and the protection of the welfare of its students.

Next, Dyer argues that the defendants illegally retaliated against her, in violation

of 29 U.S.C. § 215(a)(3), after she engaged in FLSA-protected activity. Specifically, she alleges that she was terminated after told Kirkegaard that she believed some workers in Northwest Middle School should be paid extra for starting back to work prior to the normal school year, and questioned whether they were exempt employees under the Act. The defendants argue that the court should grant summary judgment as to Dyer's FLSA retaliation claim because the evidence fails to show that she actually advanced any complaint as to the Northwest employees, and because the evidence fails to show any causal connection between her comments and her termination. *See McMillin v. Foodbrands Supply Chain Serv.*, 272 F.Supp.2d 1211, 1218 (D. Kan. 2003) (noting elements of claim).

The court finds that a material question of fact exists as to whether Dyer indeed engaged in protected activity. While Hudson denies hearing, or remembering, any particular grievance by Dyer about the Northwest employees, Dyer alleges that she did express her opinion that nonpayment of the Northwest staff "would violate the Fair Labor Standards Act," and that managerial employees in the Human Resources Department should not be considered FLSA exempt. The FLSA prohibits retaliation based on a complaint, which is an assertion "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights" under the Act. *Kasten v. Saint-Gobian Perf. Plastics*, 563 U.S. ___, 131 S.Ct. 1325, 1335 (2011).

However, the court finds no evidence suggestive of retaliation. Other employees discussed FLSA issues without any adverse job action. Even assuming Dyer did make the general FLSA comments she now describes, these comments occurred months before the defendants began to explore the allegations against the plaintiff. This investigation arose due to the plaintiff's own independent actions.

Dyer's FLSA retaliation claim is subject to summary judgment because the uncontroverted facts of the case establish that the defendants had a legitimate and nonretaliatory motive for the adverse employment action. The investigation independently

conducted by Kirkegaard demonstrated that Dyer had committed serious offenses, both in her operation of the random substitute teacher assignment process, and in her complete inaction with respect to numerous complaints against her husband. These infractions occurred prior to Dyer's assumed FLSA comments. When they were brought to light in August of 2011, the defendants commenced an investigation which provided a clear justification for the defendants' actions.

Further, the court finds, for reasons stated previously and as summarized below, the plaintiff's summary claim that the defendant's actions were pretextual completely fails. There is no evidence the defendants ignored misconduct of similar gravity by other employees, or that they acted contrary to any applicable policy in cases of serious ethical misbehavior and self-dealing. The core conclusions of the defendants' investigation were, and remain, essentially unrebutted. *See Conner v. Schnuck Markets*, 121 F.3d 1390, 1394 (10th Cir. 1997) (employing *McDonnell Douglas* analysis in FLSA retaliation action).

Next, the court finds that summary judgment is appropriate as to Dyer's claim of deprivation of a property interest without due process. A public employee charged with serious misconduct is entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). Where, as here, the employee has received a substantial opportunity to present her side of the story prior to her termination, "the importance of the procedures in the post-termination hearing is not as great," because "simply giving the employee 'some opportunity' to present [her] side of the case 'will provide a meaningful hedge against erroneous action.'" *Benavidez v. City of Albuquerque*, 101 F.3d 620, 626 (10th Cir. 1996) (quoting *Loudermill*, 470 U.S. at 543 n. 8).

Here, Dyer was given a fair hearing with Kirkegaard and Vaughn, in which the District laid out the charges against her, prior to her termination. She also was offered the right to have a separate hearing before Hudson. She waived that right, and submitted a

written response to the results of the investigation. Dyer was ultimately able to state her case before a before a committee of the full seven-person Board of Education. Neither Board member serving on the committee had been involved in the investigation.

Dyer has presented only two arguments that the process employed by the District was fundamentally unfair. First, she concludes that the attorney for the School Board "acted in the role of a prosecutor." (Dkt. 152, at 39). Second, she complains that she was not allowed to present her arguments a second time, by appearing at the meeting of the full Board on October 25, 2011, when the Board met and approved the recommendation of its committee.

Dyer cites no authority in support of her contention that due process precludes *any* involvement by legal counsel, or that a public board may not delegate fact-finding and recommendations to a committee of the board.

As to the former argument, Dyer relies on *Coats v. Board of Education*, 233 Kan. 394, 662 P.2d 1279, 1286 (1983), but this case, decided under Kansas law, is neither controlling nor relevant. In that case, the Kansas Supreme Court concluded that the defendant school board had violated the provisions of K.S.A. 72-5438, providing for school board hearing committees, went it appointed its own attorney, who had been previously involved in the nonrenewal recommendation at issue, *directly to the committee as a member*.

Here, there is no evidence whatsoever that counsel had any involvement with the case other than to examine witnesses at the hearing and prepare a report and recommendation at the direction of the committee members. The evidence is uncontroverted that the committee members independently arrived at their decision. Again, the plaintiff, who was represented by counsel at the post-termination hearing, has presented no authority holding that due process is violated when there is any involvement by counsel on the other side.

In support of her other argument, the plaintiff cites the observation in *Withrow v.*

*Larkin*, 421 U.S. 35, 55 n.22 (1975) that, after an initial investigatory meeting, the plaintiff doctor was given "the opportunity to appear before the Board [of Medical Examiners] to 'explain' the evidence." But nothing in that case supports or even suggests that such an appearance before a full board is essential in all cases. Rather, in *Withrow*, the Court simply held that the procedures of the Board, which effectively combined the investigatory and adjudicatory functions, did not inherently violate due process, especially where those procedures "show that the Board had organized itself internally to minimize the risks arising from combining investigation and adjudication." *Id.* at 55 n. 20. Thus,

> No specific foundation has been presented for suspecting that the Board had been prejudiced by its investigation or would be disabled from hearing and deciding on the basis of the evidence to be presented at the contested hearing. The mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the board members at a later adversary hearing. Without a showing to the contrary, state administrators 'are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.' *United States v. Morgan*, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941).

*Id.* That conclusion is equally true here. The facts show a careful separation of the investigatory and adjudicatory functions, and the record is devoid of any suggestion of bias against Dyer by any School Board member.

Morever, there is substantial authority to the contrary. In *Tonkovich v. Kansas Board of Regents*, 159 F.3d 504 (10th cir. 1998), the Tenth Circuit rejected the argument of a terminated law professor that he did not receive due process at the hands of a Hearing Committee established by the Board of Regents, which subsequently recommended disciplinary action against him. The court explicitly agreed that "that under *Loudermill*, Professor Tonkovich was entitled only to notice of the charges, an explanation of the evidence against him, and an opportunity to respond." 159 F.3d at 521.[2]

---

[2] *See also Megill v. Board of Regents of State of Fla.*, 541 F.2d 1073, 1080 ( 1976) (observing, in claim of violation of due process in decision refusing tenure, that "[n]either is there a prohibition against delegating to some board members the responsibility of reviewing the record").

Dyer's argument is not only unmoored to any specific authority, it finds no support in the actual evidence. Here, counsel collected the evidence and asked questions of witnesses, but there is no evidence that the counsel took any unfair or improper action. Counsel did not summarize the evidence, or otherwise argue the case.

During the hearing, Dyer was represented by her own counsel. She testified in her own behalf and was able to cross-examine other witnesses. The committee hearing officer has submitted an affidavit stating that termination was the appropriate recommendation, and there is no evidence whatsoever that District counsel had any undue influence on the decision of the hearing.

Similarly, there has been no showing that a full board hearing is constitutionally required, or that it would have made any substantial difference. Moreover, the court bears in mind that this the defendant is one of the largest school districts in the state, and that its Board comprises seven part-time members. Meeting as a full board, to separately consider in detail the arguments involved in every personnel action, would create a real and substantial burden on the effective management of the District. Due process requires notice and an opportunity to respond, in an environment free from bias or undue influence. The court finds that the plaintiff received due process in the present case.

As noted earlier, Dyer also advances a state law claim for breach of implied contract due to her termination. Under Kansas law, employment is ordinarily deemed terminable at will by either party to the contract; however, the facts of a particular case may give rise to an inference that the parties intended to preclude the employer from firing a worker for other than just cause. *See Allegri v. Providence-St. Margaret Health Ctr.*, 9 Kan.App.2d 659, 663, 684 P.2d 1031 (1984). Here, Kirkegaard's recommendation for the plaintiff's termination effectively assumed that the termination required just cause, and accordingly the court assumes for purposes of the present motion that an implied-in-fact contract actually exists.

The uncontroverted facts establish that the District had just cause for the termination. As discussed earlier, the District had strong and admitted evidence showing that the plaintiff had abused her position of trust by circumventing the random substitute teacher selection process to the benefit of herself and her husband. In addition, the plaintiff had failed to act on a serious complaints about the performance of her husband as a substitute. The plaintiff neither counseled her husband about the complaints, or alerted her superiors to the existence of repeated complaints.

The plaintiff argues that the District had no just cause for the termination, because its rationale was exaggerated, because other employees were not disciplined, and because the District did not follow a policy of progressive discipline. These arguments fail in light of the uncontroverted facts.

As noted earlier, while Dyer refuses to admit to a precise number of wrongful substitute assignments, the fact remains that a substantial number clearly occurred, and indeed were generally admitted by Dyer during the District's investigation. Similarly, while Dyer now seeks to rationalize her failure to act on the complaints against her husband, the facts remain that the complaints were numerous, and that Dyer took no specific response as far as either alerting any superior to this situation, or issuing any official warning or counseling to her husband.

The District thus possessed two substantial grounds of concluding that Dyer had violated a position of trust. Either ground alone would have justified termination. With respect to the policy of progressive discipline, Dyer has failed to show that the policy was intended to apply in cases of direct and substantial misconduct for personal profit. Similarly, Dyer has failed to show that employees accused of similar conduct were not terminated.

Finally, the court notes the separate motions for relief by the individual defendants. Defendant Kelli Mathis has separately moved to dismiss the action for lack of proper

service. Individual defendants Lane and Kirkegaard have moved for summary judgment to the extent that Dyer asserts any Title VII claims against them. (Dkt. 146, at 34-35). *See Cotto v. Citibank*, 247 F.Supp.2d 44 (D.P.R. 2003). The plaintiff rejoins that she has sued "the individual defendants—Dr. Lane, Ms. Kirkegaard, and Dr. Mather—only in their personal or individual capacities, and only under § 1981." (Dkt. 152, at 23). As to Mathis, the plaintiff argues that service was proper, or, if not, the court should extend the time for service.

The plaintiff also specifically represents that such an extension, even after the District's motion for summary judgment, will not prejudice the action, since "[t]he arguments advanced by USD 500 in support of its motion for summary judgment apply equally to the claim against Ms. Mather." (Dkt. 150, at 4).

The court finds that the service of process on defendant Mathis was proper, and denies the Motion to Dismiss. The court dismisses the disparate treatment claims against Lane, Mathis, and Kirkegaard, to the extent that these are asserted under Title VII. (See Pretrial Order, Dkt. 141, at 20 ¶ 6(a)(1) (alleging "[d]isparate treatment in violation of Title VII and Section 1981")).  Given the representation that the summary judgment arguments "apply equally" to defendant Mathis,[3] the court grants summary judgment as to all individual defendants, given its findings and conclusions with respect to the merits of plaintiff's racial discrimination claim.

IT IS ACCORDINGLY ORDERED this 24th day of June, 2013, that the defendant Mather's Motion to Dismiss (Dkt. 147) is denied; defendants' Motion for Summary Judgment (Dkt. 145) is hereby granted and all claims of the plaintiff are hereby dismissed.

---

[3] On the basis of the plaintiff's representation, the court denies Mather's separate request, if her Motion to Dismiss is denied, for the filing of a separate motion for summary judgment (Dkt. 154, at 2) and construes the School District's Motion for Summary Judgment to extend to the claims against all the defendants.

s/ J. Thomas Marten

J. THOMAS MARTEN, JUDGE